Good morning, Your Honors. Kurt Hamrock, McKenna Long & Aldridge, Washington, D.C. on behalf of Appellant VSE Corporation. With me at Council Table is Ralph O'Neill, also representing VSE. I'd like to reserve three minutes, if possible, for rebuttal. Your Honors, in April 2011, terrible tragedy occurred, resulting in the death of several fine individuals. The question today is whether the litigation arising from that incident should be heard in state court or in federal court. VSE Corporation asserts that the federal incident is sufficiently great that the case should be heard in federal court. Not only the merits of the case, but also the federal defenses that VSE has identified in connection with the litigation. At the heart of the matter is the interpretation of the Federal Officer Removal Statute. The statute itself has been around for many, many years. It recently was amended to actually make the statute even broader in terms of its application. Prior to its amendment, the Supreme Court and other courts have given it very broad interpretation indeed, and indeed it has been given recognition as a case in which removal should be liberally granted in light of the important federal interests at stake. The cases that are interpreted have ranged from the Supreme Court cases in Willingham, Watson, Mesa, as well as the Ninth Amendment. In this case, there are two principal issues. First, whether there is sufficient evidence to establish the causal nexus between the work that was being done by the contractor for the federal government and the events that gave rise to the claim in this case. And second, whether the federal contractor has set forth a plausible or colorable federal defense. One or more. Those two federal defenses at issue in this case, the government contractor defense and principles of derivative sovereign immunity. In this case, the facts are clear that the contracted issue was exceptionally broad. We start with the proposition that this was not merely a corporation that was in a highly regulated industry. Instead, it was a corporation that was doing the work of the federal government. It had been for many years serving in that role across the country. Counsel, doesn't this issue, this case turn on how much the federal government directed the work of your client? How closely it was monitored? How specific the instructions were? Could you address those issues for me? Because those are important to me. In the cases where the contract has been considered to be part and parcel of the government, there has been a very close connection with the government in terms of detailed specification, in terms of close oversight. So, could you kind of walk me through how your client fit within the parameters of those cases? Yes, Your Honor. I'll be happy to do so. The two places to look for that sort of comparison are the contract itself, the interactions between the contractor and the government, and the claims that are alleged in the complaints to see whether there is an overlap between those. Start with the contract itself. This was not merely a contract for the delivery of commercial off-the-shelf widgets. Instead, this was an ongoing service contract. The direction of the federal government to take possession, to safeguard, secure, to handle, store, and ultimately, all when directed by the federal government, to destroy or otherwise dispose of the... Those are very general instructions, but I didn't see in the record where the government told VSC specifically how long to store, how to destroy, what chemicals to use, what mechanisms to use. And to me, that's the difference between this case and other cases where the contractor has been determined to be a government actor. So, what's your response to that observation? Your Honor, twofold. First of all, the complaints themselves don't confine the claims in this case to the way in which these fireworks were destroyed. They extend to the way they were handled, the way they were stored, the way they were treated before the incident took place. So, that's one response. The complaint cannot set the legal relationship between the parties. That's done by the parties themselves. The government and the contractor establish what their relationship is. The complaint can't do that. Yes, Your Honor. I would agree, but the allegations in the complaint need to be balanced against the terms of the contract and the relationship between the contractor and the government. So on the one hand, we have the terms of the contract that said, don't do anything with these items that we give you until the federal government tells you to do something with them. You may not destroy them. You may not move them. You may not allow access to them until we, the federal government, tell you what to do with them. So, we start from that framework. Then we go into the specifics of the destruction. There was a destruction plan in this case. Who developed that destruction plan? The destruction plan was initially developed by the contractors, passed along to the federal government, approved by the federal government, and the government gave the go-ahead to start with the destruction. So, do you have a case that would support your argument that the contractor, in this case, would be a government actor where the contractor proposed the plan and the federal government, without modification, approved it? What's your strongest case authority to support your argument that, under those circumstances, the contractor would be a government actor? Your Honor, the line of government contractor defense cases, starting with Boyle, would all suggest that the government, so long as there was some level of review, now it needs to be not just a rubber stamp, agreed, but it needs to be some level of review. If the proposal is reviewed and approved by the federal government, that's sufficient for purposes of element one of the government contractor defense. Now, in this case, we have evidence of that, and that evidence is sufficient, at this stage of the proceedings, for purposes of the federal officer of movement. Again, are you relying on Boyle to support your argument that the contractor, in this case, should be considered to be a government actor? Is that your strongest case? Yes, Your Honor. I guess, in terms of being a government actor, I would not put it that way. I would refer to it as the government contractor has sufficiently established, at this stage of the proceedings, evidence of the government contractor defense. So the government contractor defense itself doesn't require the contractor to show that it was a government actor, and that is, in fact, one area where we believe that the district judge erred in this case. So you're saying that the Boyle case makes you eligible for the government contractor defense, and that's the beginning of your argument that this case should be in federal court. Is that what you're saying? Yes, Your Honor. That is one of the plausible federal defenses that DSE has put forward. Now, one of the... What do we make of the dismissal by the district court of the third-party claim against the government? Your Honor, we believe that the dismissal colored the district court's view and caused it to apply a too stringent standard for purposes of removal. The district court, when it ordered the remand, referred extensively to its prior decision, and in doing so, it referred to its prior conclusions that there had been no day-to-day close supervision of the contractor. That dismissal wasn't appealed, was it? No, Your Honor, it was not. That conclusion, although the district court did cite to some of the right federal officer removal cases, that's too stringent a standard for purposes of federal officer removal here. Instead, what's required is that nexus requirement and the plausible, not the established, but the plausible federal defense. How plausible is a government contractor defense in the context where the government itself is not liable? I mean, the logic behind Boyle and what so far in the circuit has been a military contractor, but I understand the argument it shouldn't be limited to military. The logic is that the government can take action, and the government takes some of its actions through private contractors. If the action is really the government's action, then the private contractor should be put on the same level as the government. But if the government itself is not liable, I'm not sure I understand why the contractor should have a defense to a third party who's been injured if the government itself is not liable to that third party, or the third party liability indirectly liable to that injured party. I got my parties backwards there, but you get the drift. So having trouble seeing how colorable this defense is if, in fact, the government itself is not liable. Well, Your Honor, the Boyle decision and its progeny took exactly that notion, that the government would not be liable in these kinds of cases where there were dismissals. Oh, because of sovereign immunity. Because of sovereign immunity. That's not the basis for the dismissal of the government here, though, by the district court. Well, Your Honor, in this instance, the district court dismissed on several grounds, some of which were directly the discretionary function exception of the Federal Tort Claims Act. So in essence, it was that the government cannot be liable in this case, which sets up the assertion by the contractor of the government contractor defense if it can set forth the three elements. Now, in this instance, you know, those three elements, you know, first of all, there's a recognition, is there a conflict here? Is there a conflict between state tort law and what the contractor was doing under its contract? I think it's important in this instance to look at the complaints, because the complaints in this case make a large number of allegations, not just with respect to destruction, but with respect to all sorts of things. But let's focus on destruction. One of the allegations in the complaint is that the contractor, VSE, breached its duty, failed in its safety responsibilities by using a flammable material such as diesel oil to dismantle the fireworks and explosives. The use of diesel oil was expressly called out in the plan that the contractor provided to the federal government that was approved by the federal government. So we have a direct conflict here between what the contractor proposed to do and what the federal government approved, and what plaintiffs allege state tort law requires. Well, I'm not sure how direct that conflict is, because the level of approval here suggests just that. It was a pretty routine approval. It's not that these plans were drawn up or even it appears closely scrutinized by the government. It was left to the contractor to figure out how to do the destruction. Well, Your Honor, in addition to the plan itself, which, as I said, explicitly called out the use of diesel oil as a part of that destruction process, we also have evidence in the record that on multiple occasions, officials from the United States government observed the process. They went to the firing range to see the incineration of the fireworks. They went to the storage facility and saw the way the materials were being stored and handled at that point. So there's definitely... Where's the direction coming from? Who is it that's proposing how this is to be done? It appears to be your client. And the government may have contractual authority to say, no, we don't like that. But the government's not taking on the role of an insurer of your client, for example, in the sense of I'm here from Cigna and I'm checking to see how you're doing things because we're insuring your risk and so forth. The government has some role like that, but as the facts have been related to us and as they're described by the district court in both orders, and you're right, the district court was influenced by the first order, I don't get the sense coming out of this that this is really a government operation. It's for the government, but who's calling the shots? Well, Your Honor, we would submit that at this stage of the proceedings, there's at least enough evidence in the record for the court to determine that a federal forum should decide whether there's enough for the government contract or defense. When you say enough at this stage, now what's the test? Plausibility? Yes, Your Honor. Plausibility, colorability, and the cases as we've cited them have suggested that's a relatively low standard. Earlier this year, the Ninth Circuit in the Latie case issued a decision on federal officer removal with respect to the nexus requirement, the Ninth Circuit panel essentially dealt with that in a paragraph at the end of its decision, when it concluded that in light of the contracted issue, the obligations, the work that was being done, there was a causal nexus between the work the federal government had employed the contractor to do and the claims that were in the case itself with respect to the government contractor defense, the Ninth Circuit panel determined that sufficient evidence had been presented at that stage to consider the government contractor defense in a federal forum. Indeed, at the end of the opinion, the Ninth Circuit concluded, it may well be that the government contractor defense will not apply in this case, but that's an issue that should be decided in a federal forum as opposed to a state court. Now, the... Yes, Your Honor. Yes, Your Honor. Speaking of the federal contractor defense, isn't the Ninth Circuit case law that that applies only to military contractors? Your Honor, there is a wide variety of case law on that very issue. But the Ninth Circuit case law. The Ninth Circuit case law is mixture, Your Honor. Originally, the first decision was the Nielsen decision. The Nielsen decision did state that the defense applied to military contractors. The facts of the Nielsen case were such, the product at issue was actually commercial paint. So, you know, there's a distinction between that and the activities that were involved here. This was not a commercial operation. This was the safeguarding and destruction of unexploded ordnance. So, point number one. Point number two, the recently... The ordnance, is that the same as fireworks? Yes, Your Honor, explosives. In recent cases, most recently, a couple of weeks ago in the Gomez decision, the Ninth Circuit recognized that Boyle, which, although it dealt with a military contract, did not confine itself to military contractor defense. And, in fact, there's a lot of language in there that would apply to civilian cases. It recognized that Boyle might apply beyond the facts of that particular case. There are other courts... So there really wasn't cause for that panel to give thought to that question. Yes, Your Honor, but it did make that statement in the opinion, which suggested... Made what statement? It made the statement that the government contractor defenses, Boyle... I want to make sure it's right because I know Your Honor served on that panel. Boyle need not be confined to the facts of that particular case. Now, the panel didn't have to reach that because the party in that case was trying to use Boyle as an immunity defense. And the panel pointed out that, no, it's a preemption defense. But we would submit that that statement, combined with other statements by other courts in this circuit, at the district court level, as well as other circuit courts elsewhere, all suggest that it is at least a question worthy of further development. And, as we would submit, it should be further developed by the federal courts as opposed to the state courts. Your position is that this is not a settled question in the Ninth Circuit? Yes, Your Honor. All right, counsel, would you like to save the balance of your time for rebuttal? I would, Your Honor. Thank you. We'll hear from opposing counsel. Good morning, Your Honors. Steve Hasaka. I'm going to speak on behalf of all the plaintiffs so you won't have to hear the same thing four different times, hopefully. I just wanted to address, answer the question you asked Judge Rawlinson about the contract. In fact, VSC had a very large service contract to provide services to the Treasury Department on forfeiture, seized materials, and that contract was, I think, about a $25 million contract. What happens, apparently, is as there are specific forfeitures or seizures that take place around the country, what VSC would do would be to issue purchase orders to various subcontractors to go and handle a particular type of seizure. So if you go back and look at the general contract, there is nothing in that general contract that talks about how this particular seizure of fireworks were to be disposed of. That happened when the government was looking for a means and methods to do that, and that's when VSC came up with their property destruction plan or the disposal plan for the fireworks. And in fact, in this case, there appears to be three different iterations of that. The first one was where VSC, through Donaldson, said that they were going to just take these fireworks in total, soak them in diesel, take them out to the Cocoa Head firing range, and then start to burn them. When they found out that that wasn't really efficient, they decided to change that, and they were actually cutting little holes or slits in parts of the fireworks to allow the diesel fuel to soak a lot faster and a lot better more thoroughly. And then when it turned out that that wasn't really as efficient and as fast as they wanted it, they in fact started to dismantle the fireworks. They would take the fireworks apart, and that's when they were placing the different components of the fireworks in different containers. One of the containers was supposedly diesel oil, but in fact, when the accident happened, it wasn't when they were in the process of actually incinerating or burning the fireworks, but when they were in the process of doing the dismantling. And that means the methods all came about through VSC and their subcontractor. And what was, I think, most important about this is that the final method, the final iteration of how the fireworks were to be dismantled, that process was never conveyed to the government, and the government never had a chance to even know that they were going to utilize this process, so the government really didn't have any input in that. Is your claim limited to a claim that's based on that particular scenario, that is the cause of the accident was the particular technique being used that had not been cleared through the government? At this point, Your Honor, yes. That's the only claim your client is making? No. No, not at all. The problem is, and the defendant makes reference to the complaint, and at this stage I suspect the complaint is all-encompassing. I confess I have expressed real skepticism as to the applicability of the government contractor defense in these factual situations, but the question raised on the defense is whether it is plausible, and more to the point, whether it is a federal court that should make that judgment, and why isn't it at least sufficiently plausible that the defense should be adjudicated by a federal court? Thank you, Your Honor. I think that Judge Seabright went through a very extensive analysis applying a Boyle test and then applying Earsley, and what he came out with at the end is that there wasn't a sufficient nexus, there wasn't a colorful defense, and he didn't even address it as the Ninth Circuit did in Gomez in simply saying that the government contractor defense here is not going to apply to a non- only will apply to a military contract for procurement. He went through and analyzed the contract, as I just tried to mention a few minutes ago, and he analyzed the process by which the dismantling came about, and I think what he concluded was that the government really had no input in this. He also concluded that there really wasn't a conflict between the state law claims that the plaintiffs were making and any federal interests that were here. So I think he went through that analysis very carefully and what he concluded, and we agree that there is no plausible claim. Even if you set aside Gomez entirely, there just isn't sufficient evidence to support that. And that brings me back to the final point, and that is, as Judge Toshima asked, and that is that in the motion to dismiss a third-party complaint by the federal government, some of the plaintiffs filed their own motion to dismiss. My client specifically filed a substantive joinder in that motion to dismiss, and so all of the issues that came up in the motion to remand were issues that had already been decided by Judge Seabright, and there was more than sufficient opportunity for VSC to appeal that decision, which they did not. So, counsel, what about the plans that were approved by the federal government? How do you analyze those claims? The plan that was approved was there was a plan to soak the fireworks in diesel oil, take them out to the Cocoa Head shooting range, and burn them. It's really just about two sentences you'll see in the disposition order. That's it. But if the federal government approved that plan, why doesn't that at least give the defendants a plausible argument? Because two things, Judge. One, the explosion did not occur while carrying out that plan. But that goes back to whether or not you're limiting your complaint to the plan that was not approved by the government. So you kind of fudged on that. And I did. And the truth is when we were preparing the complaint and we're continuing to do our investigation, we're not always sure what the facts are ultimately going to be. But we do know that the plan that was submitted to the government was not the plan that was followed. And so the best argument that I think that VSE could make, assuming that the accident happened in a different way, is that they submitted a plan, the government reviewed it, understood it, knew what was involved in it, and approved that plan, and VSE was simply carrying out those specific instructions. And the analogy would be manufacturing a product to specific specifications by the government. But, in fact, that wasn't the case. And I think that was the critical issue here. Is it your position? I'm just trying to understand your position. Is it your position that there was never a plan that was conceived of by the subcontractor and approved by the government and carried out in the way it was approved by the government? Is that your argument? Not exactly. It appears that because of the length of time that it was taking VSE and the subcontractor to dispose of the fireworks, they initially tried to dispose of some of the fireworks in that manner. Okay, so when you started off, you told us there were three iterations of the plan to dispose of the fireworks. The first iteration was what? Soak the fireworks in their entirety in diesel and then take them to the Cocoa Head Diamond Ring. So was that iteration approved by the government? Yes. Okay. So is it your position that even though that iteration was approved by the government, it never came to fruition? It did come to fruition for some of the fireworks, but that's not the process that was in place at the time of the explosion. Agreed. So if that's not the process that was in place at the time of the explosion, how do you predicate liability upon that? We're not predicating liability against the government because of the fact that they did not approve. Not against the government, against VSE. So are you predicating liability against VSE on that plan, even though it was approved by the government? I'm sorry. We're predicating a liability against VSE and the subcontractor for changing the original plan and that there is evidence or will be evidence that the means and methods that they used to dispose of the fireworks, that is cutting it open, storing it in the way they did, was a dangerous means and methods of doing it. So, yes, that is the claim. What I'm trying to understand for myself is what your claim entails. The first iteration that was approved by the government, just soaking, not the cutting open, just soaking the fireworks, you said was partially implemented. Yes. Are you proposing any liability based on that particular, segmenting that particular operation out, are you proposing any liability at all on that particular iteration of the plan? Yes. Okay. So you understand, yes, because there are other means and methods other than that to dispose of fireworks. And the choice that was made in this particular case, we believe, was a negligent choice. Even though it was approved by the government? Yes. Okay. And so if that method of disposal was approved by the government, why isn't there at least a plausible claim of a government contractor defense in that first iteration? Okay. Again, you would have to go through the, if you're going to do that type of an analysis, a boil analysis, you would have to go through each of those, of the criteria. And when Judge Seabright went through that criteria, the government's approval was simply, I think, I'm not sure if I'm quoting him right, was almost just simply a rubber stamp. It was not a situation where the government was making a conscious decision knowing the risk of it. If anything, the government did not have that type of expertise. The government was relying on the expertise of VSC and its subcontractor. Okay. So then the second iteration was what? Second iteration was they were actually cutting little slits or holes in what they call the cake, which are round balls that are shot up into the air and explode with all of the visual display. They were actually cutting little holes in that to allow the diesel to seep inside of that and supposedly burn faster. And so was that plan approved by the government as well? No. Okay. And so was that the iteration that caused the explosion? It was part of it. Okay. The final, the last iteration was where they were actually disassembling, for example, those cakes, the round balls, and cutting. They were actually emptying the powder into separate containers. And there's a propellant charge that pushes the firework up into the air. They were cutting open those cardboard tubes, separating out the black powder into separate containers. And so, and I'll just put one more factor in here about what the difference is. All of this work was taking place down at the White Kelly bunkers. Part of the reason why so many people were killed and injured in this particular explosion is that the explosion took place in a very confined area. Had they been doing all of this work out at Cocoa Head Range, it's likely if there's the same type of explosion, maybe the people that were directly working with it would have been seriously injured or killed. But it's less likely that people around it would have had that same condition. My client, for example, died from asphyxiation because they were at the back of the bunker and the explosion and fire sucked all of the oxygen out of it. That is unlikely to have occurred out at Cocoa Head. So this is another, again, change in the means and methods and location of the process. Thank you very much. All right. Thank you, Gail. Well, let me ask one question, which it puzzles me. I've seen this in other cases. This detour has apparently delayed the case for like a couple of years. Is it that important to be in state court as opposed to federal court to justify the time this has taken? I'm not sure. I was in the Leyte case, so I was on the other side. So I'll tell you, in some of my personal experience is that in some of the state courts, we're able to get to trial faster than there is in the federal court. I know you're all aware of how busy you are. I've been set for how many cases in district court, and you all know that every time there's a criminal case, we're going to get bumped. So I've been first set on many cases in district court, and I've ended up two years down the road in any event. So from our perspective, we think we'd probably have been to trial by now if we were in state court. You probably wouldn't have been to trial by now if you'd stayed in federal court. I don't think that's true, because Judge Seabright had that very long murder case, and that really pushed almost one year off of our calendar. So maybe if we were in front of another judge, it might have happened. All right. Thank you. Thank you. Thank you, Your Honor. With respect to your last question, I believe the court may be aware that the case has not been stayed in the federal district court. Discovery has been proceeding, so the case has been progressing. So time has not necessarily been wasted by doing so. Going back, Your Honors, to the points that you raised. Are you saying after all this time, discovery is still ongoing? Your Honor, I've only been engaged with respect to the appellate matter, but it's my understanding that discovery is ongoing between the parties now and began soon after the judge ordered the remand and the appeal was taken. So matters have been progressing. Your Honors, with respect to the government contractor defense, your questions to counsel for the plaintiffs has established that the destruction plan that had been reviewed and approved by the United States government is in conflict with some of the claims that the plaintiffs still are putting forward in the case. That's what I was trying to pin down, because he talked about three iterations. Do you agree that there were three iterations of the destruction plan that were submitted? No, Your Honor, we do not. The destruction plan called for the fireworks to be prepared before being soaked in the diesel fuel. Now, what prepared means, how far you can extend that, whether prepared reasonably extends to cutting, taking off pieces of the fireworks, that's a point of contention and a point of argument. So if we just go with the description that opposing counsel gave us of the first iteration being soaking the fireworks in the diesel, do you agree that was approved by the government? Yes, Your Honor, and we don't only contend that. The district court found that, that that plan had been submitted, reviewed, and approved by the United States government. What about cutting into the fireworks so that the diesel could soak in more deeply? Was that change approved by the government? No, Your Honor, that had not been submitted to the United States government. We would possibly disagree with the notion of being a change. It was an additional step that was taken. That step was not reviewed and approved by the United States government. How about the final and most drastic change according to counsel for the plaintiffs, the fact of taking the materials apart and then moving to a different location to dispose of the fireworks? Your Honor, I believe that the third iteration was that the materials were dismantled there at the storage facility, soaking occurred, and it was still part of the original plan that the soaking occurred after a period of time. The materials were then moved to the firing range where they were incinerated. So that portion of it has not changed throughout the different iterations. But opposing counsel at least expressed the view that the change to dismantle and to move the location of destruction was not approved by the government. Yes, Your Honor, the decision of the subcontractor to manipulate the fireworks in certain ways, by cutting and then by dismantling, that was not reviewed and approved by the United States government. Was it reviewed and approved by VSC? Yes, Your Honor, that had been submitted to the contractor. The additional step, the soaking, that never changed. That had been submitted to the United States government as a step at the beginning, had been reviewed and approved. That step didn't change, and that step, as I mentioned before, is specifically called out in all of the plaintiff's complaints as being something that is a failure, that using a flammable material such as diesel oil to dismantle the fireworks and explosives was a failure of a safety responsibility. What about the location? Was that a change? No, Your Honor, the preparation process and soaking always took place at the storage facility. But the actual disposal, was that supposed to take place at the firing range? Yes, Your Honor, that was called out in the initial plan, and that process did not change either. The incineration process always took place at the firing range. I thought opposing counsels made a distinction between a bunker and a firing range. Yes, Your Honor, what he said was it would have been better, and it was a breach of the contractor's responsibilities of reasonable care to allow the preparation process to take place at the storage facility. Now, Your Honor... Is that where the accident occurred, at the storage facility? Yes, Your Honor, it did. What do you mean, storage facility? Is that the same as what your opponent refers to as the bunker? The bunker, yes, Your Honor. So the storage facility was a bunker, or a bunker like it was? Yes, Your Honor, it was a secured bunker. It was heavily reinforced and so forth. And in fact, as I mentioned during my opening statement, the United States government was fully aware that that's where the preparation was taking place. That's where the fireworks were being stored. And where they would be destroyed? No, Your Honor, the fireworks were not destroyed at the bunker. They were destroyed at the firing range. But the preparation was all done at the bunker, and the record is clear that the United States was well aware of that as well. Thank you, counsel. Thank you.  The case just argued is submitted for decision by the court. I'll call the case of FK v. Department of Education. Please. So opposing counsel has not arrived. The counsel will give you the option of submitting the case on the briefs, or if you'd like to argue, we will give you the opportunity since you sat here.  Please do. Have you heard anything from opposing counsel at all? I have not. Did you wish for me to make a phone call or attempt a phone call? No, that's not your responsibility. Thank you. We were just wondering if maybe you had heard something. I hadn't, but I am aware that the center that he works for, I believe is located in this building, but I believe he lives off-island on Maui. We'll proceed for now. All right. This case before this court actually stems from an administrative proceeding on an IDEA case, actually two separate administrative proceedings that went up on a joint appeal to the United States District Court. Those two administrative decisions were affirmed by the District Court and has been submitted by the plaintiff to this court seeking reversal of both decisions. I would like to inform the court that there is also a kind of a companion case that does involve the same parties that is pending before the United States District Court involving Act 129, which is in question in the 067 proceeding. Are you counsel for that case as well? I am. So why did the District Court stay ruling on that issue in this case? My understanding is the court thought that there was a chance that this court  in either dispensing of some of the issues that are pending in that proceeding, perhaps if this court were to make findings relating to Act 129 and its appropriateness and legality and that sort of thing, if this court did elect to make findings in that regard. Also, there are factual issues that were litigated in the 067 administrative proceeding where basically the parties are trying to determine who is at fault for the withholding of payment pursuant to Act 129. And should this court actually make findings against any one party, that might assist the United States District Court in the civil proceeding that is still pending. All right. It seems to me the primary issue in this case, putting aside this preemption business, is whether or not you, the State, had the right to stop payments. Right? Now, tell me why. There was a State put order, right? There was. All right. Now, and the State put, was that Loveland, wasn't it? It was. All right. And the payments you were making were to Loveland. Correct. Now, in light of the State put order, tell me why the State was authorized to stop payments. What transpired in the legislature in 2011 in the State of Hawaii was a recognition
judges: Tashima, Rawlinson, Clifton